**In re H. Keith HENSON, Debtor.**

**No. 98–51326–ASW.**

United States Bankruptcy Court, N.D. California.

Jan. 7, 2002.

Stanley A. Zlotoff, Esq., Law Offices of Stanley A. Zlotoff, San Jose, CA, for Debtor.

Elaine M. Seid, Esq., McPharlin Sprinkles Thomas, Thomas R. Hogan, Esq., Law Offices of Thomas R. Hogan, San Jose, CA, Helena K. Kobrin, Esq., Moxon & Kobrin, Los Angeles, CA, Samuel D. Rosen, Esq., Paul Hastings Janofsky Walker, New York City, for Religious Technology Center.

MEMORANDUM DECISION DENYING MOTION TO DISMISS BANKRUPTCY CASE BASED ON FUGITIVE DISENTITLEMENT DOCTRINE

ARTHUR S. WEISSBRODT, Bankruptcy Judge.

Before the Court is a motion by Religious Technology Center ("Creditor"), a

creditor of H. Keith Henson ("Debtor"), to dismiss this Chapter 13 [1] case based on the fugitive disentitlement doctrine. The motion is opposed by Debtor.

Creditor is represented by Elaine M. Seid, Esq. of McPharlin, Sprinkles & Thomas LLP; Thomas R. Hogan, Esq. and Leslie Holmes, Esq. of the Law Offices of Thomas R. Hogan; Samuel D. Rosen, Esq. of Paul, Hastings, Janofsky & Walker LLP; and Helena K. Kobrin, Esq. of Moxon & Kobrin. Debtor is represented by Stanley A. Zlotoff, Esq.

The matter was briefed, argued on October 17, 2001, and submitted for decision at that time. Thereafter, on November 2, 2001, Creditor filed unsolicited pleadings in the form of a "supplemental" brief and declaration, addressing events that occurred after October 17. On December 10, 2001, Creditor filed further unsolicited pleadings in the form of a "supplemental" declaration addressing events that occurred after November 2. Debtor was served with both sets of pleadings at the time of filing and has filed no response.

## I.

### BACKGROUND

Debtor commenced this bankruptcy case by filing a petition under Chapter 13 on February 23, 1998.

Creditor holds a judgment that was issued pre-petition by the United States District Court for the Northern District of California in the amount of $75,000 statutory damages for Debtor's infringement of Creditor's copyright. Creditor's claim filed in this bankruptcy case totals $1,060,636.86, for the judgment as well as

pre-petition attorney's fees of approximately $866,000, pre-petition sanctions sought in the District Court of approximately $96,219, and pre-petition costs of some $23,500;[2] Creditor contends that Debtor is also liable for District Court judgments based on post-petition acts by Debtor, which amounts are not included in Creditor's claim.

Creditor has objected to confirmation of Debtor's Chapter 13 plan, alleging that it is not feasible and has been proposed in bad faith. Creditor has also filed a motion to dismiss the bankruptcy case with prejudice or convert it to Chapter 7, alleging that Debtor filed bankruptcy in bad faith. Trial of both Creditor's objection to confirmation and Creditor's motion for dismissal or conversion for bad faith is in the process of being scheduled.

Creditor now seeks dismissal of the bankruptcy case for a new reason, urging that the fugitive disentitlement doctrine should be applied.

## II.

### FACTS

Creditor alleges the following facts without substantial contradiction by Debtor. For purposes of Creditor's motion, these facts will be accepted as true.

In 2001, Debtor was charged by the Riverside County District Attorney with violating California Penal Code ("PC") § 422.6 by intimidating, threatening, and oppressing Scientologists on account of their religious beliefs. Debtor was convicted on April 26, 2001 and released on his own recognizance until May 16, 2001, when he was scheduled to be sentenced.

---

1. Unless otherwise noted, all statutory references are to Title 11 U.S.C., "the Bankruptcy Code", as amended in 1994.

2. The claim has never been amended to show whether any amounts over and above the $75,000 statutory damages were ever awarded by the District Court.

Prior to that date, Debtor "fled" to Canada. On May 13, 2001, Debtor stated on the Internet that he would not appear for sentencing. On May 15, 2001, Debtor said on the Internet that he was entitled to seek political asylum in Canada on the basis of having been persecuted by the governments of California and the United States.

When Debtor failed to appear for sentencing on May 16, the State Court revoked his release, charged him with violating PC § 1320 by failing to appear, and issued a bench warrant without bail for his arrest.

Debtor then announced on the Internet that he is staying in Canada and seeking "refugee" status, a process that he said he expects to take at least two years.

Debtor has now been sentenced by the State Court in Riverside County *in absentia* to incarceration for 365 days (to be suspended if he agrees to serve 180 days' incarceration, serve three years' probation, and pay a $2,700 fine). Upon return to California, Debtor will be tried in the State Court in Riverside County on additional criminal charges of failing to appear for sentencing; Creditor believes that conviction is "likely", and would result in Debtor being sentenced to incarceration for another six months.

On October 24, 2001, Debtor made statements on the Internet that Creditor considers to be violations of a permanent injunction issued by the District Court on June 16, 1997 in Creditor's copyright infringement action against Debtor. The injunction prohibits, *inter alia*, solicitation and/or publication of certain material as to which Creditor owns copyrights.

On November 22, 2001, Debtor made statements on the Internet that criticized the integrity of "the judge in my case", by which Creditor says Debtor "attacks the Riverside Superior Court Judge presiding over Debtor's criminal case".

On November 29, 2001, the State Court in Riverside County entered a minute order in Debtor's appeal of his criminal conviction, denying a motion by Debtor for appointment of counsel and ordering Debtor to show cause within twenty days as to why the appeal should not be dismissed on the grounds that "appellant is a fugitive and therefore has forfeited his right to appeal".

### III.

### FUGITIVE DISENTITLEMENT DOCTRINE

Creditor contends that Debtor should not be permitted to proceed with his Chapter 13 case while at the same time being a fugitive from justice in the State Court criminal case, citing the fugitive disentitlement doctrine. The doctrine and its basis are explained in *Degen v. United States*, 517 U.S. 820, 824, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996) ("*Degen*"):

> ... we have held federal courts do have authority to dismiss an appeal or writ of *certiorari* if the party seeking relief is a fugitive while the matter is pending. Several reasons have been given for the rule. First, so long as the party cannot be found, the judgment on review may be impossible to enforce. [citations omitted] Second, we have said an appellant's escape "disentitles" him "to call upon the resources of the Court for determination of his claims." [citations omitted] In reviewing similar practices in state courts for conformity with the Due Process Clause, we have noted further reasons for them: Disentitlement "discourages the felony of escape and encourages voluntary surrenders," and "promotes the efficient, dignified operation" of the courts. [citations omitted]

Creditor cites *Ortega–Rodriguez v. United States,* 507 U.S. 234, 113 S.Ct. 1199, 122 L.Ed.2d 581 (1993) and *Magluta v. Samples,* 162 F.3d 662 (11th Cir.1998) for the elements of the doctrine:

1/ The plaintiff is a fugitive; and

2/ The fugitive status has a connection to the plaintiff's civil action; and

3/ Dismissal of the plaintiff's action is necessary to carry out the concerns underlying the doctrine.

As set forth following, not all of the elements are present in this case and Creditor's motion must therefore be denied.

### A. Fugitive Status

The existence of the first element is not disputed. Debtor announced that he would not appear for sentencing in the State Court criminal case in May 2001, did not appear, was sentenced at that time, and has since stated publicly that he is in Canada and intends to stay there for at least two years while seeking refugee status.

For purposes of Creditor's motion, Debtor is currently a fugitive within the meaning of the disentitlement doctrine.

### B. Connection Between Fugitive Status and Civil Case

The second element is not present, because there is little or no connection between Debtor's fugitive status and his Chapter 13 case.

As Debtor points out, he is not a fugitive from this Court, he is a fugitive from the State Court in a criminal action that was commenced in 2001, three years after Debtor filed his bankruptcy petition.[3] In attempting to refute this point, Creditor cites *Morrell v. Kramer,* 2001 WL 764947, *6 (N.D.Cal.) ("*Morrell*"), where the disentitlement doctrine was applied in dismissing a federal *habeas corpus* claim by a former fugitive from a State Court criminal action, and the District Court noted that "it does not matter that the former fugitive fled from the custody of another sovereign". However, in that case, a "connection" was found between the prisoner's previous fugitive status in the State Court case and his claim for relief in the District Court, despite the existence of two different sovereigns.

The Supreme Court has indicated that a former fugitive may be disentitled if his flight has a "connection" to current proceedings. *Ortega–Rodriguez v. United States,* 507 U.S. 234, 249[, 113 S.Ct. 1199, 122 L.Ed.2d 581] (1993). A lengthy escape, for example, might justify dismissal of a fugitive's action, even after recapture, because the government may be prejudiced in locating witnesses and presenting evidence if a retrial were required, or because it may somehow make meaningful review of the former fugitive's conviction impossible or otherwise disrupt the judicial process. *See id* at 249–50[, 113 S.Ct. 1199]. Put simply, a former fugitive's action may be dismissed if granting relief is likely to result in an undue burden on the government or if the former fugitive's flight will result in significant interference with the operation of the judicial pro-

---

**3.** It appears from Creditor's "supplemental" pleadings that Creditor considers Debtor to be a fugitive from the District Court also. Creditor complains that Debtor is now "exploiting his fugitive status" to engage in contempt of Creditor's District Court injunction by his October 24 statements on the Internet, while avoiding punishment for those actions by remaining in Canada. Assuming *arguendo* that Creditor's view is justified, the fact remains that Debtor's statements of October 24 do not violate any order of this Court or make him a fugitive from this Court, and they have nothing to do with his bankruptcy case.

cess. *See United States v. Rosales,* 13 F.3d 1461, 1462–63 (11th Cir.1994). It does not matter that the former fugitive fled from the custody of another sovereign. [*Prevot v. Prevot,* 59 F.3d 556 (6th Cir.1995)]. [¶] Here, petitioner's flight from his state trial and decision to remain a fugitive for over 11 years resulted in the records of his trial being lawfully destroyed. The absence of a trial transcript or settled statement of the trial proceedings due to petitioner's flight seriously interferes with this court's collateral review of petitioner's trial error claims nearly 20 years after petitioner's state trial was held. Petitioner cannot point to the trial proceedings to prove prejudice from any trial error, the government cannot fairly dispute any assertions of prejudice, and the court cannot properly assess any such claims. Petitioner's flight should disentitle him from litigating any claims of trial error in this court. It would be "unconscionable" that petitioner's "deliberate attempt to evade his day of reckoning, successful for a time, should be allowed to impose additional burdens upon the judiciary to accommodate claims that should be forfeited by flight." *United States v. Sudthisa–Ard,* 17 F.3d 1205, 1208–09 (9th Cir.1994) (internal quotation marks and citation omitted).

*Morrell,* at *6–7. In this case, there is no connection between Debtor being a fugitive in the State Court criminal action while also being a bankruptcy debtor in his Chapter 13 case (and *vice versa*), because the criminal action is unaffected by the pendency of the bankruptcy case, and the bankruptcy case is unaffected by Debtor's fugitive status.[4] The existence of two different sovereigns may "not matter" in the sense of conclusively establishing a lack of connection and being dispositive of the issue, but it does highlight the fact that, under the circumstances here, Debtor's fugitive status and his bankruptcy case are not connected with each other.

Creditor argues that there is a connection between Debtor's fugitive status and his bankruptcy case, because Debtor is engaged in a "scheme to attack and destroy the Scientology religion"—Creditor quotes statements by Debtor dating back to 1995 about "breaking", "destroying", "killing off", and "annihilating" the Church of Scientology. Creditor contends that the bankruptcy case is just one part of Debtor's "common scheme": Debtor filed bankruptcy as a direct result of Creditor receiving judgment for copyright infringement; Debtor has stated publicly many times that such infringement was part of his effort to harm the Church of Scientology; the criminal case in Riverside County resulted from Debtor's attacks upon Scientologists based on their religion; all of these events, Creditor asserts, are related to each other and form a general pattern of Debtor's acts against the Church of Scientology, its followers, and Creditor.[5]

---

4. The latter statement may not prove to be true in the future, as discussed below. But, at this time, the Bankruptcy Court is not faced (as was the District Court in *Morrell*) with a request by the fugitive Debtor for relief that cannot be granted due to the absence of records that were destroyed as a result of Debtor's fugitive status. If Debtor remains a fugitive, and if that status eventually interferes with the administration of his bankruptcy

case, a connection such as that in *Morrell* might then exist.

5. At oral argument on October 17, Creditor's attorney described the relationship between the Church of Scientology and Creditor as follows: Creditor is a non-profit "religious corporation", which is responsible for "maintaining the integrity and orthodoxy of the Scientology religion"; Creditor is not a "parish church" and does not have members; Creditor is a "religious body of Scientology"

Creditor cites *Prevot v. Prevot*, 59 F.3d 556 (6th Cir.1995) ("*Prevot*"), where a "general scheme" was held to constitute a sufficient connection for purposes of the disentitlement doctrine. In that case, a fugitive violated probation and restitution orders in a criminal conviction for theft and fled to France when the Internal Revenue Service commenced to pursue him, then filed a civil action from France to gain custody of his children. The trial court found no "nexus" between the father's fugitive status and his custody action, but the appellate court disagreed:

> Mr. Prevot's flight and his subsequent [custody action] were, paraphrasing [*Conforte v. Commissioner*, 692 F.2d 587, 590 (9th Cir.1982)], "related components of a general scheme." He fled to escape his criminal conviction and other responsibilities to court, probation officers, victim and government, and to assemble and hold his family in a refuge beyond the reach of American courts and American responsibilities. In Mr. Prevot's hands [the custody action] is a tool used to permit him to escape American justice and responsibilities while holding his children with him. Flight was but one step, and [the custody action] the latest link, in a chain of proximately related events that began with

the Texas conviction and ended in the district court proceedings in this case.

*Prevot*, at 567. In *Conforte v. Commissioner*, 692 F.2d 587, 590 (9th Cir.1982) ("*Conforte*"), cited and paraphrased by *Prevot*, the appellate court found that a taxpayer's fugitive status from a criminal conviction for attempted evasion of employment tax liability and his civil appeal of income tax liability were "each related components of a general tax evasion scheme", so as to constitute the requisite connection for application of the disentitlement doctrine in the civil case.

■ Both *Prevot* and *Conforte* were decided before Degen. Degen does not address the concept of a "general scheme" and neither approves nor disapproves it, but *Degen* does dictate that the disentitlement doctrine be applied sparingly; such an approach necessarily limits the circumstances under which a "general scheme" can properly be found.[6] In Degen, the Supreme Court reversed the Ninth Circuit's application of the doctrine against a defendant in a civil forfeiture action that was proceeding while he was a fugitive from criminal charges of drug smuggling, and explained why the doctrine should not be used too freely:

---

that owns and licenses use of trademarks and copyrights; Creditor owns its facilities but does not own the Church of Scientology of, *e.g.*, San Jose; Creditor is "different from the religion" of Scientology but is "part of the religion", and owns the religious scriptures of Scientology and the copyrights in such scriptures; Creditor's capacity in this bankruptcy case is as a copyright owner with a judgment for Debtor's infringement thereof. In Creditor's initial brief at page 1, line 22, Creditor refers to Creditor as a "church": ". . . members of the Scientology religion—the religion of which [Creditor] is a church . . . .".

**6.** Creditor attempts to distinguish *Degen* on the basis that the fugitive in that case was the defendant in the civil action, whereas Debtor

here is the equivalent of a plaintiff; Creditor also argues that the fundamental Constitutional right of due process was an important issue in *Degen* but is not an issue here. It is arguable whether Debtor is really akin to a plaintiff—on the one hand, he seeks relief under the Bankruptcy Code and bears the burden of establishing his good faith; on the other hand, he is in the position of having to defend against Creditor's objection to plan confirmation and motion to dismiss or convert for bad faith. In any event, the rationale of *Degen* does not appear to this Court to depend upon whether the fugitive is a defendant or a plaintiff, nor upon whether fundamental Constitutional rights are at stake.

[In *Ortega–Rodriguez vs. U.S.*, 507 U.S. 234, 113 S.Ct. 1199, 122 L.Ed.2d 581 (1993)] [w]e did not rule out the possibility of appellate disentitlement where necessary to prevent actual prejudice to the Government from a fugitive's extended absence, [citation omitted] but we concluded the sanction of disentitlement was unjustified as a sanction applicable to all cases where an escape once had occurred [citation omitted]. We conduct a similar examination of the disentitlement imposed here, and find it likewise unjustified. [¶] There is no risk in this case of delay or frustration in determining the merits of the Government's forfeiture claims or in enforcing the resulting judgment. The Government has shown probable cause to forfeit the property, and Degen must refute the showing or suffer its loss. Since the court's jurisdiction over the property is secure despite Degen's absence, there is no danger the court in the forfeiture suit will waste its time rendering a judgment unenforceable in practice. [¶] The Government is on stronger ground in suggesting the criminal prosecution against Degen might be compromised by his participation in the forfeiture case. The problem stems from the differences between the discovery privileges available to Degen in each case.... [¶] ... [O]f course, Degen's absence entitles him to no advantage. If his unwillingness to appear in person results in non-compliance with a legitimate order of the court respecting pleading, discovery, the presentation of evidence, or other matters, he will be exposed to the same sanctions as any other uncooperative party. A federal court has at its disposal an array of means to enforce its orders, including dismissal in an appropriate case. Again, its powers include those furnished by federal rule, [citations omitted] The details of these steps are committed to the discretion of the District Court; it would be premature to consider now the precise measures the court should adopt as the case proceeds. The existence of these alternative means of protecting the Government's interests, however, shows the lack of necessity for the harsh sanction of absolute disentitlement. Consideration of some of Degen's defenses, such as the statute of limitations, appears to require little discovery. If they have merit, the Government should not prevail; if they are groundless, the Government's interests will not be compromised by their consideration. [¶] We have yet to consider two other purposes said to be advanced by disentitlement: The need to redress the indignity visited upon the District Court by Degen's absence from the criminal proceeding, and the need to deter flight from criminal prosecution by Degen and others. Both interests are substantial, but disentitlement is too blunt an instrument for advancing them. Without resolving whether Degen is a fugitive in all the senses of the word debated by the parties, we acknowledge disquiet at the spectacle of a criminal defendant reposing in Switzerland, beyond the reach of our criminal courts, while at the same time mailing papers to the court in a related civil action and expecting them to be honored. [citations omitted]. A court-made rule striking Degen's claims and entering summary judgment against him as a sanction, however, would be an arbitrary response to the conduct it is supposed to redress or discourage.... [T]he sanction of disentitlement is most severe and so could disserve the dignitary purposes for which it is invoked. The dignity of a court derives from the respect accorded its judgments. That respect is eroded, not enhanced, by too free a recourse to rules foreclosing consideration of claims on the merits. [¶]

There would be a measure of rough justice in saying Degen must take the bitter with the sweet, and participate in the District Court either for all purposes or none. But the justice would be too rough. A court's inherent power is limited by the necessity giving rise to its exercise. There was no necessity to justify the rule of disentitlement in this case; to strike Degen's filings and grant judgment against him would be an excessive response to the concerns here advanced.

The Supreme Court's admonition against overly zealous use of the disentitlement doctrine was made in a case with a strong connection between the fugitive status and the civil action: Degen was a fugitive because he had fled from prosecution of drug smuggling charges, and the civil action sought his forfeiture of property that had been purchased with the proceeds of the smuggling. Here, there is no such clear connection: Debtor filed bankruptcy after Creditor obtained a District Court judgment for money damages based on Debtor's infringement of copyrights owned by Creditor; three years later, Debtor was convicted in the State Court of crimes against members of the Church of Scientology (which Creditor insists is not the same entity as Creditor) and became a fugitive in that criminal action; Debtor continues to be a bankruptcy debtor in a Chapter 13 case while he is a fugitive; there is no current activity in the bankruptcy case pending trial of Creditor's objection to plan confirmation and Creditor's motion to dismiss or convert the case for bad faith.[7] Given those circumstances, a connection cannot reasonably be found unless the "general scheme" theory of *Prevot*

and *Conforte* is applicable to the facts of this case and dispositive. Creditor urges that the doctrine should be controlling here, but the links between events are too tenuous under the cautious approach that is required by *Degen*.

The "general scheme" that Creditor attempts to demonstrate amounts to little more than Debtor's hostile attitude toward the Church of Scientology. Creditor argues that the filing of the bankruptcy case was a step in Debtor's longstanding fight against the Church of Scientology, but there is no showing that Debtor filed bankruptcy solely, or even primarily, in order to harm the Church—Creditor (which insists that it is distinct from the Church) received a large judgment against Debtor, and Debtor's bankruptcy schedules show no significant assets other than his home—on the surface, it appears that Debtor filed bankruptcy to deal with the economic consequences of Creditor's judgment, *i.e.*, to reorganize his financial affairs, which is the very purpose of Chapter 13. During the bankruptcy case, Creditor has frequently sought orders compelling Debtor to comply with discovery requests and complained that Debtor was uncooperative—Debtor has countered with charges that Creditor's discovery was burdensome, invasive of his privacy and that of others, and designed to harass—regardless of who is right (and neither may be wholly right), the discovery disputes do not establish that Debtor has been using the bankruptcy case as a means to advance a campaign against the Church of Scientology (which Creditor says is a different entity from Creditor). Debtor's motive in filing bankruptcy and his manner of conducting the case will be considered as part of the

---

7. The Chapter 13 Trustee has not moved to dismiss the bankruptcy case due to any failure by Debtor to make payments under his unconfirmed plan, which suggests that such payments are being made and that the Trustee is able to administer the case despite Debtor's current absence.

"totality of the circumstances" test required by *In re Warren*, 89 B.R. 87 (9th Cir. BAP 1988) ("*Warren*") and *In re Padilla*, 213 B.R. 349 (9th Cir. BAP 1997) ("*Padilla*") when Creditor's objection to plan confirmation and motion to dismiss or convert for bad faith are tried. At this time, for the purposes of this motion, Creditor has not shown that Debtor's bankruptcy case is part of a "general scheme" to harm the Church of Scientology, such as to establish the connection that is necessary for application of the disentitlement doctrine.

### C.  Necessity of Dismissal

The third element is not present, because dismissal of Debtor's bankruptcy case is not necessary to address the concerns underlying the disentitlement doctrine.

Creditor contends that Debtor's actions ranging from his pre-petition copyright infringement to his failure to appear for sentencing and his flight have constituted "contumacious behavior, harassment, stalking, terrorist threats, criminal behavior, and a persistent refusal" to accept adverse rulings, coupled with the attitude that access to the courts is a "sport" and "entertainment"—Creditor argues that such conduct justifies application of the disentitlement doctrine. Creditor cites *Pesin v. Rodriguez*, 244 F.3d 1250, 1253 (11th Cir.2001) ("*Pesin*"), a post-*Degen* case that applied the doctrine to a party who

> ... repeatedly defied court orders and ignored contempt sanctions and has continued to evade arrest. Her behavior to date leaves little doubt that she would defy an adverse ruling. Moreover, it would be inequitable to allow [her] to use the resources of the courts only if the outcome is a benefit to her. We cannot permit [her] to reap the benefits

of a judicial system the orders of which she has continued to flaunt [*sic*, should be "flout"].

*Pesin* does not stand for the proposition that the disentitlement doctrine should be applied whenever a party displays a bad attitude. In that case, a mother did not comply with an order granting custody of her children to their father, and appealed the order while hiding the children and herself in a secret location—the father had already won the right of custody and was being wrongfully deprived of it by the mother, even while she availed herself of the appellate process. The Court properly noted that it would be "inequitable" for the mother to receive the benefits of the judicial system without bearing its burdens and abiding by its rules. Debtor here is not currently in the position of the mother in *Pesin*—at this time, all that the Bankruptcy Code requires Debtor to do is make payments to the Chapter 13 Trustee and, as noted above, there is no indication that he is failing to perform that duty. Further, Creditor is not currently in the position of the father in *Pesin*—Creditor has filed a proof of claim to collect its judgment, and Creditor's objection to plan confirmation and motion to dismiss or convert for bad faith are pending trial; Creditor is asserting the rights provided by the Bankruptcy Code and is not being wrongfully deprived of them by Debtor. Under *Degen*, the disentitlement doctrine is not to be applied merely to accomplish what appears to be "rough justice", but must be reserved for situations where foreclosing consideration of the merits is actually necessary to avoid some specific injustice.

Creditor contends that such necessity does exist here, due to "strong" practical considerations. Creditor argues that trial of Creditor's objection to plan confirmation and motion to dismiss or convert for bad faith cannot be held in Debtor's absence,

because he would have to testify on his own behalf and, even if he chose not to testify, Creditor would be entitled to question him about issues raised by Creditor's objection and motion. Creditor maintains that, if Debtor stays in Canada for at least two years while pursuing refugee status (and perhaps much longer), trial cannot be held while he is gone, nor should it be delayed that long—delay would constitute giving "aid and comfort" to a "lawbreaker and a fugitive", disregard Chapter 13's requirements that Debtor act with honesty and good faith, and "be an unseemly accommodation for a Federal court to make". Creditor cites *Sarlund v. Anderson,* 205 F.3d 973, 974 (7th Cir.2000) (*"Sarlund"*), a post-*Degen* case, which notes that *"Degen* as we read it shifts the emphasis from considerations of dignity, deterrence, respect, propriety, and symmetry found in a number of earlier cases [citations omitted] to the kind of practical considerations that inform the decision whether to dismiss a suit with prejudice as a sanction for mistakes, omissions, or misconduct". Creditor approves of *Sarlund's* result concerning a fugitive who attempts to "exploit" the court based on his "self-imposed exile":

> ... the plaintiff's fugitive status places him entirely beyond judicial control, thus creating a situation severely prejudicial to his adversaries. Since his whereabouts are unknown, he cannot be deposed by the defendants or made to pay costs (should he lose) or attorneys' fees (should he lose and his suit be adjudged sanctionably frivolous). There is nothing to prevent him from using the litigation process to harass the defendants with impunity, and no measure that we can think of short of dismissal of his suit that will protect the defendants from such harassment.

*Sarlund,* at 975. Creditor also contends that it is "seriously" prejudicial for Creditor to incur the expense of preparing for a trial at which Debtor may not appear, so the fact that the Court could dismiss the case if Debtor fails to appear for trial does not prevent Creditor from suffering "severe" prejudice prior to that time—Creditor notes that *Sarlund* found an abuse of discretion and held that the trial court should have dismissed the fugitive plaintiff's action rather than put the other parties to the expense of defending on the merits when the fugitive was "using the litigation process to harass the defendants with impunity".

Debtor states without contradiction that, although Creditor complains that the litigation will be "stalled" by Debtor's absence, Creditor has already deposed Debtor for "several days". Debtor points out that, if Creditor prevails in the pending trial, plan confirmation will be denied and/or the case will be dismissed or converted regardless of whether Debtor is present; Creditor would not be unable to receive relief if the bankruptcy case were continued in effect pending trial rather than being dismissed now, because the relief sought by Creditor at the upcoming trial is nothing more than denial of plan confirmation, or dismissal or conversion of the case, all of which relief could be granted with or without Debtor's presence. Debtor notes that the trial could be handled in various ways, including permitting Debtor to appear "live electronically", or by accepting written declarations and deposition transcripts, or even by issuing judgment to Creditor by default if Debtor fails to appear.

In *Sarlund,* the fugitive was the plaintiff and was prosecuting litigation against defendants who could not properly prepare for trial to defend themselves because the fugitive was not available for discovery, and whose litigation expense could not be shifted because the fugitive could not be compelled to pay. Those factors are not

present here. With respect to discovery, Creditor does not deny that it has already conducted extensive discovery—indeed, discovery may be complete, since the matter was in the trial setting stage over six months ago.[8] If Creditor's discovery is already complete, Debtor's absence will not deprive Creditor of discovery; if Creditor seeks to do further discovery, Debtor's absence may or may not impede or prevent legitimate discovery and that issue can be dealt with if and when it arises (and, as *Degen* points out, dismissal is among the sanctions available for failure to provide discovery). As for Creditor's trial preparation expense, the fact that the case was ready to be set for trial over six months ago suggests that much (perhaps most) of that expense has already been incurred. Creditor has denounced Debtor's suggestion that Debtor might be able to appear at trial "live electronically" or through declarations or deposition transcripts, but no motion for such relief has been filed and the issue of whether Debtor should be permitted to participate in trial without being physically present is not before the Court. If Debtor does not attend trial, he risks losing, since he bears the burden of demonstrating the good faith that is required to defeat both Creditor's objection to plan confirmation and Creditor's motion to dismiss or convert for bad faith, *see Warren* and *Padilla.* However, at this point, it has not been established that Debtor definitely or probably will not appear for trial, and it is entirely possible that he will decide that bankruptcy relief is sufficiently important to warrant his appearance—if he does not, the chips will fall where they may. If Creditor does prevail at trial and Debtor remains a fugitive, Creditor's victory will not be rendered meaningless by Debtor's absence, because Creditor already has a money judgment and that is not the relief sought by Creditor's objection to plan confirmation and motion for dismissal or conversion for bad faith. Rather, Creditor seeks denial of plan confirmation and/or dismissal or conversion of the bankruptcy case—pursuant to § 1307(c), denial of plan confirmation would ultimately lead to dismissal or conversion of the bankruptcy case unless Debtor were able to propose a confirmable plan by a date certain, and dismissal or conversion is precisely what Creditor seeks. Accordingly, the practical reasons advanced by Creditor do not constitute necessity for application of the disentitlement doctrine.

## IV.

## CONCLUSION

For the reasons set forth above, Creditor's motion to dismiss Debtor's Chapter 13 case based on the fugitive disentitlement doctrine is denied.

Counsel for Debtor shall submit a form of order so providing, after review by counsel for Creditor as to form.

---

8. That process came to a halt when Creditor filed a motion to disqualify the undersigned and sought to have the District Court withdraw reference of the bankruptcy case pursuant to 28 U.S.C. § 157(d). Both of those motions were denied. Creditor has appealed from denial of the recusal motion, and has now filed this motion.